[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This case is before the court on remand from our state Supreme Court. The remand order reads as follows:
 Thus, for the reasons set forth in this opinion, we find it necessary to reverse the judgment of the Appellate Court and remand the case for a new hearing to establish a new set of comprehensive financial orders, including a new alimony award. We recognize that this unique case provides very little precedential value, and we hope not to see another of its kind again. Finally, given the longevity of these proceedings and with recognition of the patience of the parties involved, we strongly urge that this matter be given an expeditious reassignment for rehearing.
 The judgment of the Appellate Court is reversed and the case remanded to that court with direction to remand the case to the trial court for a new hearing on the financial orders.
As of the date of dissolution of the marriage of the parties (July 11, 1988), the plaintiff was employed by the United States Postal Service. He had gross weekly wages of $724.92. He had deductions for federal income tax of $152.69, Retirement $50.19, FICA $10.51, Union Dues $6.63 and Health Insurance $17.41 for total deductions of $237.43 and a net weekly income of $487.49. The parties owned a condominium at 12 Quarry Village, Cheshire, Connecticut with a total value of $150,000 to $170,000 and a mortgage balance of $20,000 and total equity of $130,000 to $150,000. He owned a 1983 Chevrolet with a value of $2,500, a loan balance of $403.62, and an equity of $2,096.38. He had personal clothing with a value of $750 and a credit union account with a balance of $450. He owned stocks and bonds with a total value of $4,005.60. He had liabilities CT Page 11959 totaling $4,396.49 and weekly expenses totaling $434.50. He also had his interest in his pension plan that he did not show on his financial affidavit dated July 1, 1988. He also had a Western Reserve Life IRA that he did not show on his financial affidavit dated July 1, 1988. That IRA had an approximate value of $2,000 and was disclosed to the trial court by the plaintiff on July 11, 1988. He also owned on July 11, 1988, an Idex Fund IRA that had an approximate value as of July 11, 1988, of $6,900 that was neither shown on his financial affidavit or disclosed to the trial court.
As of July 11, 1988, the defendant was employed at a doctor's office with gross weekly wages of $151.56 and net weekly wages of $125.19. In addition to her one-half interest in the condominium that she owned with the plaintiff, she also owned a 1978 AMC with a total value of $200 and a 1978 Mustang with a total value of $600. She owned furnishings with a total value of $4,000. She had one liability with a balance due of $1,000. Her basic weekly expenses amounted to $366.46 that included a $30 weekly payment for assistance to children who were in college which was discretionary on her part. Her financial affidavit dated July 1, 1988, did not reflect the fact that she owned a 20% interest in a piece of real estate.
The trial court on July 11, 1988, in addition to the plaintiff's pension, ordered that:
 (1) the plaintiff pay the defendant alimony in the sum of $175 per week for a period of five years, with the alimony to terminate on the event of the defendant's death, remarriage or cohabitation; (2) the parties retain their one-half interest in the family condominium and that the defendant be allowed to continue to live there for a period of five years at which time, if the unit was sold, the proceeds are to be divided equally between the parties; (3) the parties equally divide any of the plaintiff's remaining investments; and (4) the plaintiff pay the defendant's attorney's fees of $3000 within ninety days of the order.
A number of motions were subsequently filed by the parties regarding the sale of the condominium. On January 23, 1996, the court entered an order allowing the defendant to purchase the plaintiff's 50% interest in the condominium located at 12 Quarry Village, Cheshire, Connecticut, by payment to him in the amount of $50,900. Upon receipt of that payment the plaintiff was ordered to transfer by way of quit-claim deed all of his right, title and interest in the property. The defendant subsequently CT Page 11960 paid to the plaintiff the $50,900 and presently is the sole owner of the condominium.
In an attempt to assign this case expeditiously for rehearing, this court held numerous status conferences in open court with the parties.
The initial status conference held with the parties to determine when they will be ready to hold the remand trial was on March 27, 2001.
Both the plaintiff and the defendant appeared at the status conference held on March 27, 2001. Neither party was prepared to proceed to trial on that date.
The next status conference was held on April 17, 2001. Both the plaintiff and the defendant appeared at that status conference. Neither party was ready to proceed to trial as of that date.
The next status conference was held on May 2, 2001. Both the plaintiff and the defendant appeared at that status conference. The plaintiff through his attorney stated that he had not made a decision as to what position to take on the issue of substantial intervening circumstances.
The next status conference was held on May 4, 2001. Both the plaintiff and the defendant were present on that date. The proposed written orders submitted by each party on May 4, 2001, was found by the court not to comply with the Practice Book and each party was directed to submit revised proposed orders. The court had a status conference with the parties later on May 4, 2001. Both parties were informed in open court on May 4, 2001, that the trial would begin on May 8, 2001 at 9:30 a.m. Both parties stated that they were ready to go to trial on May 8, 2001.
The transcript of the proceeding on May 8, 2001, provides in part as follows:
 THE COURT: It is not unusual when a party submits a financial affidavit, for the other party to disagree with what is in it. That's why we have cross examination to allow questions to be asked to determine whether a financial affidavit is accurate or not accurate. That's handled by cross examination. To the extent that you believe his affidavit that was submitted dated May 4, 2001 is not accurate, you have the right to ask him questions about it, but that's not a reason to postpone a trial to require somebody to change the affidavit.
CT Page 11961
 MS. MARTONE: At least five days before you submit the financial affidavit and at least ten days before, according to Practice Book 25-30, I guess it is.
 THE COURT: These affidavits were exchanged this past Friday.
MS. MARTONE: Yes.
 THE COURT: Everybody said at that time they were ready to proceed with trial.
MS. MARTONE: No, I was not ready to proceed.
 THE COURT: Ma'am, I'm not bound by either party's claim for relief. I don't have to accept his claims for relief either in form or substance. I don't have to accept your claims for relief in form or substance. My job is to hear the evidence, hear the testimony and enter whatever orders I feel are appropriate. So the fact that you don't like his claims for relief or he might not like your claims for relief, that's not reason for postponing the trial.
 THE COURT: Ma'am, I'm not going to force either of you to change your financial affidavit because the other party believes it's not accurate. That's the reason that we have cross examination. That's the reason each party has the right to question the other party.
 MS. MARTONE: I need three more days, Your Honor, at least.
THE COURT: Why?
 MS. MARTONE: The law says I need at least five days after a financial affidavit is submitted.
 THE COURT: I asked each party on Friday when the financial affidavits were exchanged, whether each party was prepared to go forward today and each party said yes.
 THE COURT: We'll proceed today through the rest of the day. We'll proceed tomorrow morning since that CT Page 11962 will be rescheduled. If the plaintiff completes his case prior to tomorrow morning, I will not require you to start your case until a week from today at 9:30, since that's the next assigned trial date after today and tomorrow, but we'll proceed today.
MS. MARTONE: Pardon me, say that again.
 THE COURT: We'll proceed today, plaintiff can proceed to present his evidence. We are scheduled to be here all day today. We are scheduled to be here tomorrow morning only. If the plaintiff finishes his case prior to 1:00 tomorrow, I'll not require the defendant to start her case until a week from today, but the defendant's case will start by a week from today at 9:30.
 MS. MARTONE: Your Honor, you're not asking him to submit a full financial disclosure for me?
 THE COURT: That's not correct, ma'am. He submitted his financial affidavit. You submitted yours. If either party disagrees with the content of either financial affidavit, they can ask the other party questions. You'll have a chance to ask him questions if you believe any part of his affidavit that he submitted, dated May 4, 2001, is not correct. You can ask him questions about it.
 THE COURT: Your request is denied. We'll proceed today. He will have a chance to start his case. We'll have tomorrow morning on trial. You will not have to start to present your evidence until a week from today at 9:30.
 MS. MARTONE: I have no choice in the matter, Your Honor, because you won't approve of my continuance. Thank you, Your Honor.
 THE COURT: You're welcome, ma'am. Before we call our first witness on this case, is there anyone else who wishes to be heard on any other case that is on for trial?
 The record should reflect the defendant has left the courtroom.
CT Page 11963
It is clear from the transcript of May 8, 2001, that the defendant was informed that the trial was to resume one week from that date which would be May 15, 2001.
The trial resumed on May 15, 2001. The defendant did not appear in court on that date. She informed caseflow that she thought the case was scheduled for trial for May 16, 2001. and not May 15, 2001. The court continued the trial until May 16, 2001. On May 16, 2001, the defendant did not appear in court. Caseflow informed the court on that date as follows:
 MR. SWEENEY: Yes, Your Honor. I received a call from Ms. Martone yesterday in the morning stating she would not — couldn't — would not — it was not coming to trial, then she went on to tell me that she wasn't feeling well.
 I later in the day received another phone call from Ms. Martone saying that she wasn't feeling well and she had made an appointment this morning, this date, at 8:30 to go to an emergency walk-in clinic and that she wasn't feeling well. I asked her, following her appointment if she would give me a call and let me know the status of her medical appointment.
 As of quarter after nine this morning, I had not heard from her. At the instruction of the Court I made two phone calls ten — approximately ten, fifteen minute — between ten and fifteen minute intervals, there was no answer and there's no machine at her home.
 So, as of this moment I haven't heard from her since yesterday, but she had told me that she was not feeling well and if she was not feeling well today that she would not appear here in Court.
This court responded as follows:
 THE COURT: Plaintiff, as I understand it, is not prepared to complete your trial because of having the need for the postal information, so that until we have that that does not the plaintiff to complete, which is the reason that I'm inclined to assign the case for a week from today in the hopes that you'll have what CT Page 11964 you're looking for at that time.
 And as I said, unless there's some valid medical reason justifying the defendant's absence a week — I'm sorry, a week from yesterday, to assign it for the 22nd if there's a medical reason to justify her absence, then the case will have to be continued in all probability until that medical reason is resolved. If there's no valid medical reason and she doesn't show up a week from yesterday, then the probability is that if you are able to complete your case with the postal information then the trial will be completed. But that's a bridge I'll cross when I get to it. But first I want to see what postal information you have.
 There is also the possibility, as I said, at one of the very first status conferences when all the parties were present, some three to four weeks ago, that depending upon how clear the information is that's presented to me on the issue of whether the plaintiff was or was not vested in his postal plan on July 11, 1988, if that information has not been clarified one way or the other that I will consider having the judicial department call an expert witness in order to present the evidence. That's still in — a possibility depends upon what information you produce from the Post Office.
 THE COURT: When you send the notice out to the defendant that the case is assigned for trial for a week from yesterday, May 22nd, for 9:30 a.m. in this courthouse before me, include in the notice that — the notice will go out to both parties to both, the plaintiff and the defendant, and show on the notice that you sent the same notice to both parties that if either party claims a medical reason for not being able to appear in court that they should send to you given your address, fax number both, something from a doctor in writing substantiating the claimed medical reason for not appearing in court.
At the conclusion of the evidence on May 14, 2001, the trial was continued until May 22, 2001. The following is a portion of the proceeding that occurred on May 22, 2001:
 THE COURT: Would case flow, besides stating your CT Page 11965 name on the record, state what was done insofar as giving the defendant on the Rosato matter, docket 076997, notice to be here today?
MR. SWEENEY: Yes, Your Honor.
 For the record, Your Honor, Robert Sweeney, Family and Case Flow coordinator.
 Your Honor, this matter — when we were in Court to resume this on Wednesday, May 16th, Your Honor put this matter over to today.
 THE COURT: I'm sorry. Because of the fact that whatever is done is undoubtedly going to see the light of an Appellate Review, swear case flow in.
Right hand. ROBERT SWEENEY
 Of Waterbury Superior Court, 300 Grand Street, Waterbury, Connecticut is duly sworn in and testified as follows:
 MR. SWEENEY: Your Honor, when we were here last on this matter which was Wednesday. May 16th, Your Honor, put this matter over to today, Tuesday, May 22, at 9:30. At that time he instructed me, as per — as in the course of case flow, to send down a judicial information systems notice which is a computerized notice that we send down as a regular course of business which I did. I had it sent to both the plaintiff and the defendant.
 Your Honor also instructed me to draft a — draft a notice, that should the parties require a continuance due to a medical condition, which Ms. Rosato has previously stated she was feeling ill, that they fax over a letter from their physician stating that reason. Your Honor also instructed me to call Ms. Rosato on Friday which would have been the 18th
of May to find out if she received the — the judicial information card. And if she had not for me to read this notice to her. On Friday, May 18th, approximately 3:00 in the afternoon, I called Ms. Martone, she answered the phone. I asked her if she had received our — our notice from the Court as CT Page 11966 to the new date. She indicated to me that she had not received it in the mail. And I read her the judicial information notification report.
 THE COURT: Would you read that into the record, please?
MR. SWEENEY: Certainly, Your Honor.
 This is docket number FA860076997, Mario Rosato versus Beatrice Rosato Martone. To all counsel and pro se parties, the above named case is to resume trial on 5/22/01 at 9:30am. Attendance by all counsel and pro se parties is mandatory. Should either party require a continuance due to a medical condition, that party must provide the Court, via fax, 596-8848, is the telephone number — is the fax number, with a letter from their physician stating the medical reason for their absence. Failure to provide such a medical letter may result in the trial resuming to completion in the absence of the missing party. By the Court, Axelrod, J.
 I read that to her in it's entirety, Your Honor; at which time Ms. Martone indicated to me that she was not coming today — that her — she was not going to be present until her constitutional rights were protected. She had also went on — she went on in some length, Your Honor, about outstanding motions that were before the Court. I told her I was merely calling her to tell her the — you know — the schedule of her trial date; at which time she also told me that she considered these phone calls — my phone calls to her residence, to be harassment and that they were impacting her health in a negative manner. She, then again, went on to tell me about — she wasn't coming until certain motions were acted on and I said, ma'am, I have nothing to do with that. And at that point I ended the conversation.
 We'd also — as per the Court's instruction, Your Honor, I also had the marshal from this courthouse, serve upon Ms. Rosato a copy of the judicial information systems counsel and pro se notification report, and that is the notice that I CT Page 11967 just read into the record. State Marshal, Brian Hobart, Your Honor, indicated to me that he tried at least on seven different occasions to make in-hand service to Ms. Martone, but that there was no answer at her residence at 108 Clark Road, Unit 54, Naugatuck, Connecticut. And he left an abode copy of this. I do have the notice of the Sheriff's return, Your Honor.
THE COURT: That may be marked as Court Exhibit A.
 MR. SWEENEY: Since that time, Your Honor, I do believe that Ms. Martone made one call to the clerk's office late Friday afternoon. That call came to Mr. Phillip Groth. And it was, as far as I know, that was just to say-that she thought that these phone calls were harassing, and wished to get notification in writing of any other Court — Court notices.
 I was here all day yesterday and this morning and Ms. Martone has not contacted case flow or the clerk's office, to the best of my knowledge. And that's where we stand.
At short calendar on May 29, 2001, various motions that had been filed by the defendant were marked off as a result of her failure to appear. The defendant had been informed that this court would not decide those motions on the papers. On May 30, 2001, this case was again assigned for trial. The following is a portion of the May 30, 2001, proceeding:
THE COURT: Good morning. This is —
MR. GROTH: Good morning, Your Honor.
 THE COURT: — the matter of Rosato verses Rosato, docket number 076997. Will counsel please identify yourself for the record.
 MR. CAULFIELD: Attorney James P. Caulfield, representing the Plaintiff in this matter, Mario S. Rosato.
 THE COURT: The Court notes that the Plaintiff is present but that the Defendant has again failed to appear as is the case yesterday, on the short calendar matter.
CT Page 11968
 The Clerk of the Court for Waterbury is here. Would the Clerk please identify yourself for the record.
 MR. GROTH: Yes, Your Honor. My name is Philip Groth, I am the Judicial District Chief Clerk.
 THE COURT: Would you state on the record what was done insofar as notifying the Defendant of yesterday's short calendar matter that she failed to appear at, as well as today's trial date that she's again failed to appear at.
 MR. GROTH: Yes, Your Honor. Last Tuesday, May 22nd, our office sent out a notice via the U.S. mail that — it was positively mailed Tuesday afternoon — indicating the four motions that were scheduled for short calendar, yesterday. The Plaintiff's objection to Defendant's Request for Disclosure, the Defendant's Motion for Judicial Appointment of an Expert Witness and two motions by the Defendant to present evidence. We mailed that out on Tuesday.
 On Thursday, we were aware that a call — there was a call that came in from Ms. Rosato or actually, I believe a call came in from perhaps, from Mr. Caulfield's office indicating that he had — they had received word that Ms. Rosato wanted the matter taken on the papers. And in response to that, to ensure that Ms. Rosato was aware that there was some — it was a matter requiring her presence we sent out a notice, another notice from the office on Thursday, the 24th indicating that the parties — the language had all parties and counsel of record are required to personally attend the hearing.
 On Friday afternoon, in my office I received a call from Ms. Rosato and she was questioning whether she needed to be here on Tuesday. And I indicated, that Your Honor had indicated the matter would be going forward on Tuesday. She expressed to me two things. One, that she wasn't interested in coming in because she still did not feel as though the other party had filed the required financial affidavit. And CT Page 11969 then, she also indicated that she had plans and that she wasn't going to change her plans for Memorial Day weekend and — to come to Court when she didn't feel that it was necessary for her to come to Court. At that time, I also indicated to her that she should be receiving a notice if she hadn't already, from the Case Flow Office for the hearing on Wednesday.
THE COURT: Today.
 MR. GROTH: For — for today's Court business. And she indicated to me that she had not received that notice, yet. I told her that it was my understanding that it was mailed out; she should be receiving it by Saturday. And her only response to that was that she still did not have the information regarding the financial affidavits and she did not see how she could possibly be expected to go forward on Wednesday.
 THE COURT: I'm satisfied that she has notice of today's proceeding and she has again failed to appear as she had on prior days that this — this case was assigned. I appreciate your — your time in this matter. Any questions that counsel for the Plaintiff has of our Chief Clerk?
The trial was completed on May 30, 2001, without the defendant ever appearing to testify or cross examine the plaintiff or offer any exhibits into evidence.
The rule on remand is that in the absence of exceptional intervening circumstances occurring in the meantime, the date of the granting of the divorce would be the proper time as to which to determine the value of the estate of the parties upon which to base the division of property.Sunbury v. Sunbury, 216 Conn. 673, 676 (1990). Both § 46b-81 (a) regarding property division and § 46b-82 regarding alimony provide in part that at the time of entering a decree dissolving a marriage the superior court may assign to either the husband or the wife all or any part of the estate of the other and may order either of the parties to pay alimony to the other.
At the March 27, 2001, status conference, this court stated to the parties as follows:
 THE COURT: What I intend to do on the date the trial begins, is to first ask the plaintiff if there's any CT Page 11970 claim by the plaintiff that there are exceptional intervening circumstances occurring between the date of the original granting of the divorce on July 11, 1988 and the present time. If the plaintiff says, yes, then the plaintiff will have the right to present evidence or testimony as to what those alleged substantial intervening — as what those alleged exceptional intervening circumstances are. If the plaintiff says no, then I'll ask the defendant the same question as to whether the defendant claims there are any exceptional intervening circumstances between July 11, 1988 and the present time. If the defendant says, yes, then the defendant will have an opportunity to present evidence and testimony as to what those alleged intervening circumstances are. If the defendant says no and the plaintiff says no, then the financial orders to be entered, will be as of the date the divorce was granted on July 11, 1988. If either party claims there are exceptional intervening circumstances, I'll hear the evidence and testimony as to what those alleged intervening — exceptional intervening circumstances are; and rule as to whether or not I find that there are or are not exceptional intervening circumstances.
Counsel for the plaintiff took the position on the first day of trial on May 8, 2001, that there were no exceptional intervening circumstances occurring between the date of the granting of the divorce and the present time. The defendant was present in court at the commencement of the trial on May 8, 2001.
The defendant did not present any evidence or testimony on the issue of exceptional intervening circumstances. This court has therefore used the financial circumstances of the parties that existed on July 11, 1988, as the proper date to determine the value of assets, the income of the parties, and the entering of alimony and/or property orders and/or attorney's fee orders.
The per curiam decision remanding the case also stated that the trial court should determine whether the plaintiff's pension benefits vested, and if they did vest, when did they vest.
In Krafick v. Krafick, 234 Conn. 783, 788-89, 663 A.2d 365 (1995), the court defined vesting as follows:
 n. 12. By "vested" we refer to pension interests "in CT Page 11971 which an employee has an irrevocable . . . right, in the future, to receive his or her account balance (under a defined contribution plan), or his or her accrued benefit (under a defined benefit plan), regardless of whether the employment relationship continues." 3 Family Law and Practice (A. Rutkin ed., 1995) § 36.13[2], P. 36-71; see id., § 37.11[1][b], pp. 37-157 through 37-159; see also 2 Valuation and Distribution of Marital Property (J. McCahey ed., 1991) § 23.02 [2] [a], p. 23-8; see Thompson v. Thompson, 183 Conn. 96, 100 n. 3, 438 A.2d 839
(1981) ("[v]ested benefits . . . refer to those accrued benefits to which the employee has a nonforfeitable right to receive at retirement age whether or not he is in the service of the employer at that time"). Prior to vesting, an employee's accrued benefits may be forfeited by termination of employment. Once the employee with a vested pension interest reaches the age of retirement and elects to retire, his rights are said to be vested and matured. See 3 Family Law and Practice, supra, § 36.13 [2], p. 36-71, and § 37.11[1][b], p. 37-159; see also Majauskas v. Majauskas, 61 N.Y.2d 481, 491, 463 N.E.2d 15, 474 N.Y.S.2d 699 (1984).
The court finds the following additional facts regarding the vesting issue. The plaintiff commenced employment with the United States Postal Service on January 4, 1964. He continued in that employment until he retired on January 2, 1992. The plaintiff was born on December 26, 1929. The plaintiff is an annuitant under the Civil Service Retirement System (CSRS).
5 U.S.C. § 8333 (a), § 8338 and § 8336 relate to the plaintiff's pension rights. The relevant provisions of those sections are as follows:
5 U.S.C. § 8333 (a) Eligibility for Annuity provides as follows:
 An employee must complete at least five (5) years of civilian service before he is eligible for an annuity under this subchapter (5 U.S.C.S. § 8331, et seq.).
 5 U.S.C. § 8338 Deferred Retirement provides in part as follows:
 (a) An employee who is separated from service or transferred to a position in which he does not CT Page 11972 continue subject to this subchapter (5 U.S.C.S. § 8331, et seq.) after completing five years of civilian service is entitled to an annuity beginning at the age of 62 years.
 (b) A Member who, after December 31, 1955, is separated from the service as a Member after completing 5 years of civilian service is entitled to an annuity beginning at the age of 62 years. A Member who is separated from the service after completing 10 or more years of Member service is entitled to an annuity beginning at the age of 60 years. A Member who is separated from the service after completing 20 or more years of service, including 10 or more years of Member service, is entitled to a reduced annuity beginning at the age of 50 years.
5 U.S.C. § 8336 Immediate Retirement provides in part as follows:
 (a) An employee who is separated from the service after becoming 55 years of age and completing 30 years of service is entitled to an annuity.
 (b) an employee who is separated from the service after becoming 60 years of age and completing 20 years of service is entitled to an annuity.
 (f) An employee who is separated from the service after becoming 62 years of age and completing 5 years of service is entitled to an annuity.
 (g) A Member who is separated from the service after becoming 62 years of age and completing 5 years of civilian service or after becoming 60 years of age and completing 10 years of Member service is entitled to an annuity. A Member who is separated from the service after becoming 55 years of age (but before becoming 60 years of age) and completing 30 years of service is entitled to a reduced annuity. A Member who is separated from the service, except by resignation or expulsion, after completing 25 years of service or after becoming 50 years of age and (1) completing 20 years of service or (2) serving in 9 Congresses is entitled to an annuity.
Since the plaintiff commenced employment with the United States Postal CT Page 11973 Service on January 4, 1964, he had completed his five (5) years of civilian service on January 4, 1969 and was eligible for an annuity on January 4, 1969 as he was vested in his pension benefits on January 4, 1969. As of January 4, 1969, the plaintiff had an irrevocable right in the future to receive, regardless of whether the employment relationship continued, his pension benefits. He had a non-forfeitable right on January 4, 1969 to receive at retirement age whether or not he was in the service of the employer at that time, his pension benefits.
A number of decisions cited in United States Merit Systems Protection Board Reporter have addressed the issue of entitlement for deferred retirement under 5 U.S.C. § 8338 and entitlement for immediate retirement under 5 U.S.C. § 8336. In Blando v. Office of PersonnelManagement, 36 M.S.P.R. (1988), the court at page 104 stated in part as follows:
 ANALYSIS Eligibility for a deferred retirement is governed by 5 U.S.C. § 8338. Pursuant to 5 U.S.C. § 8338
(a), an employee who is separated from the service or transferred to a position in which he does not continue subject to Subchapter III of Chapter 83 after completing five years of civilian service is entitled to an annuity beginning at the age of sixty-two years. Although OPM erroneously analyzed the appellant's annuity claim as a claim for an immediate annuity, which is governed by 5 U.S.C. § 8336, the statute cited in the reconsideration letter, 5 U.S.C. § 8333 (a), applies generally to retirement cases under Subchapter III. This provision of the law requires the completion of five years of civilian service for eligibility-for a deferred annuity as well as for eligibility for an immediate annuity. Similarly, the regulation, 5 C.F.R. § 831.201, also applies generally to retirement cases. (Emphasis provided.)
In Connolly v. Office of Personnel Management, 37 M.S.P.R. 46 (1988), the court stated in part at pages 1 and 2 as follows:
 Section 8338(a) provides: An employee who is separated from the service or transferred to a position in which he does not continue subject to this subchapter [5 U.S.C. § 8331 et seq.] after completing 5 years of civilian service is entitled to an annuity beginning CT Page 11974 at the age of 62 years.
In addressing the alternate ages and number of years at which a person is entitled to receive annuity, in Mica v. Office of PersonnelManagement, 66 M.S.P.R. 41 (1994), the court stated in part as follows at page 204:
 A Member who, after December 31, 1955, is separated from the service as a Member after completing 5 years of civilian service is entitled to an annuity beginning at the age of 62 years. A Member who is separated from the service after completing 10 or more years of Member service is entitled to an annuity beginning at the age of 60 years. A Member who is separated from the service after completing 20 or more years of service, including 10 or more years of Member service, is entitled to a reduced annuity beginning at the age of 50 years. 5 U.S.C. § 8338 (b).
The plaintiff was born on the December 26, 1929. The following chart shows the eligibility date on which the plaintiff meets the years of service requirement and age to retire under 5 U.S.C. § 8338 Deferred Retirement and 5 U.S.C. § 8336 Immediate Retirement:
SECTION 8338 — DEFERRED RETIREMENT
 # of years of Minimum Eligibility date Applicable service required age to Plaintiff meets Subsection and date met retire # of years of of § 8338 Service required and age to retire
5 (1-4-69) 62 12-26-91 (a)
10 (1-4-74) 60 12-26-89 (b)
 20 (1-4-84) 50 reduced 1-4-84 (b) annuity
SECTION 8336 — IMMEDIATE RETIREMENT
 # of years of Minimum Eligibility date Applicable service required age to Plaintiff meets Subsection and date met retire years of service of § 8336 required and age to retire
CT Page 11975
30 (1-4-94) 55 1-4-94 (a)
20 (1-4-84) 60 12-26-89 (b)
5 (1-4-69) 62 12-26-91 (f)
When the plaintiff retired on January 2, 1992, he was 62 years old and was entitled to an immediate retirement under 5 U.S.C. § 8336 (f). He would also have been entitled to an immediate retirement as of December 26, 1989, since he was 60 years old on that date and would have met the requirement of 20 years of service as of January 4, 1984 under5 U.S.C. § 8336 (b).
A number of sections under the United States Code and under the Code of Federal Regulations are relevant to the issuance of an order regarding the plaintiff's current interest in his lifetime pension benefits. In a decision involving the plaintiff and the defendant, Beatrice M. Rosatov. Office of Personnel Management, the United States Court of Appeals for the Federal Circuit decided in part on January 25, 1999, as follows:
 As a federal employee, Mr. Rosato was entitled to certain benefits, including an annuity payable in his lifetime on his retirement. Federal law contemplates that a federal employee may yield such benefits to a spouse in divorce proceedings. In particular, the law provides that:
 [p]ayments under this subchapter which would otherwise be made to an employee, Member, or annuitant based on service of that individual shall be paid (in whole or in part) by the Office to another person if and to the extent expressly provided for in the terms of —
 (A) any court decree of divorce, annulment, or legal separation, or the terms of any court order or court-approved property settlement agreement incident to any court decree of divorce, annulment, or legal separation.
5 U.S.C. § 8345 (j)(1) (1994).
 It is well-settled that section 8345(j)(1) "authorizes [OPM] to comply with an appropriate court decree of divorce or property settlement of an CT Page 11976 employee who is entitled to payments pursuant to the Civil Service Retirement System." Donlan v. Office of Personnel Management, 907 F.2d 1132, 1133 (Fed. Cir. 1990). To implement this statute, OPM has promulgated regulations that define when an order of divorce or property settlement is a "court order acceptable for processing." See 5 C.F.R. § 838.101 (b)(1); 838.103; 838.301-838.306 (1997). The pertinent regulations specify that, to qualify for processing by OPM, the court order must identify the retirement system under which the annuity exists and expressly state the portion to which the former spouse is entitled under the court order. See 5 C.F.R. § 838.303; see also 5 C.F.R. § 838.305
(portion must be stated as a fixed amount, percentage, or fraction or formula calculable solely from face of court order). In the event OPM receives an application from a former spouse for benefits pursuant to a divorce decree, and the application fails to comply with the regulations defining an order acceptable for processing, OPM notifies the applicant of the specific reasons for disapproving the application. See 5 C.F.R. § 838.424 (1997). The applicant then has an opportunity to cure any error in the application and to reapply for benefits.
 The pertinent regulations also state that "OPM must comply with court orders, decrees, or court-approved property settlement agreements. . . ." 5 C.F.R. § 838.101 (a)(1). Moreover, OPM's regulations direct that:
 In executing court orders under this part, OPM must honor the clear instructions of the court. Instructions must be specific and unambiguous. OPM will not supply missing provisions, interpret ambiguous language, or clarify the court's intent by researching individual State laws. In carrying out the court's instructions, OPM performs purely ministerial actions in accordance with these regulations. Disagreement between the parties concerning the validity or the provisions of any court order must be resolved by the court.
5 C.F.R. § 838.101 (a)(2) (emphasis supplied). CT Page 11977
The language required in Qualified Domestic Relations Orders include 5 C.F.R. § 001, 101, 202, 501 and 502 that provide as follows:
5 C.F.R. § 001 provides as follows:
 ¶ 001 Language required in Qualified Domestic Relations Orders.
 Using the following paragraph will expressly state that the provisions of the court order concerning CSRS or FERS benefits are governed by this part. A court order directed at employee annuity (or awarding a survivor annuity) that is labelled a "Qualified Domestic Relations Order" or is issued on an ERISA form will not be automatically rendered unacceptable under § 838.302(a) or § 838.803(a) if the court order-contains the following paragraph.
 "The court has considered the requirements and standard terminology provided in part 838 of Title 5, Code of Federal Regulations. The terminology used in the provisions of this order that concern benefits under the Civil Service Retirement System are governed by the standard conventions established in that part."
5 C.F.R. § 101 provides as follows:
 ¶ 101 Identifying retirement benefits and directing OPM to pay the former spouse.
 Using the following paragraph will expressly divide employee annuity to satisfy the requirements of § 838.303 and direct OPM to pay the former spouse a share of an employee annuity to satisfy the requirements of § 838.304.
 "[Employee] is (or will be) eligible for retirement benefits under the Civil Service Retirement System based on employment with the United States Government. [Insert language for computing the former spouse's share from 200 series of this appendix.] The United States Office of Personnel Management is directed to pay [former spouse]'s share directly to [former spouse]."
5 C.F.R. § 202 provides as follows: CT Page 11978
¶ 202 Award of a percentage.
 Using the following paragraph will award the former spouse a stated percentage of the employee annuity. Unless the court order expressly directly that OPM not add COLA's to the former spouse's share of the employee annuity, OPM will add COLA's to keep the former spouse's share at the stated percentage. Paragraph 232 of this appendix provides language for excluding COLA's.
 "[Employee] is (or will be) eligible for retirement benefits under the Civil Service Retirement System based on employment with the United States Government. [Former spouse] is entitled to [insert a number] percent of [employee]'s [insert "gross," "net," or "self-only"] monthly annuity under the Civil Service Retirement System. The United States Office of Personnel Management is directed to pay [former spouse]'s share directly to [former spouse]."
 5 U.S.C. § 501 and 502 provide as follows:
¶ 501 Full annuity restored to the retiree.
 No special provision is necessary to restore the entire annuity to the retiree upon the death of the former spouse. Unless the court order expressly provides otherwise, OPM will pay the former spouse's share to the retiree after the death of the former spouse.
¶ 502 Former spouse share paid to children.
 Using the following paragraph will award the former spouse's share of an employee annuity to the children, including any adopted children, of the employee and former spouse.
 "If [former spouse] dies before [employee] the United States Office of Personnel Management is directed to pay [former spouse]'s share of [employee]'s civil service retirement benefits to surviving children of the marriage including any adopted children, in equal shares. Upon the deaths of CT Page 11979 any child, that child's share will be distributed among the other surviving children."
 The language may be modified to terminate the payments to the children when they reach a stated age. A court order that includes such a provision for termination must include sufficient information (such as the children's dates of birth) to permit OPM to determine when the children's interest terminate. OPM will not consider evidence outside the court order (and normal OPM files) to establish the children's dates of birth.
 5 C.F.R. § 838.224 and § 838.225 regarding contesting the validity of court. orders and processing amended court orders provide as follows:
5 C.F.R. § 838.224 contesting the validity of court orders
provides as follows:
 (a) An employee, separated employee, or retiree who alleges that a court order is invalid must prove the invalidity of the court order by submitting a court order that —
 (1) Declares the court order submitted by the former spouse is invalid; or
 (2) Sets aside the court order submitted by the former spouse.
 (b) OPM must honor a court order acceptable for processing that appears to be valid and that the former spouse has certified is currently in force and has not been amended, superseded, or set aside, until ORM receives a court order-described in paragraph (a) of this section or a court order amending or superseding the court order submitted by the former spouse.
 5 C.F.R. § 838.225 processing amended court orders provides as follows:
 (a) If the employee, separated employee, retiree, or former spouse submits an amended court order pertaining to payment of a portion of the employee annuity, OPM will process the amended court order prospectively CT Page 11980 only, effective against employee annuity accruing beginning the first day of the second month after OPM receives the court order unless —
(1) The court order —
 (i) Expressly directs OPM to adjust for payment made under the prior court order; and
 (ii) Determines the total amount of the adjustment or the length of time over which OPM will make the adjustment; and
 (iii) Provides a specific monthly amount of the adjustment or a formula to compute the amount of the monthly adjustment; and
 (2) Annuity continues to be available from which to make the adjustment.
5 U.S.C. § 838.234 Collection of Arrearages provides as follows:
§ 838.234 Collection of arrearages.
 Specific instructions are required before OPM may pay any arrearage. Except as provided in § 838.225, OPM will not increase a former spouse's share of employee annuity to satisfy an arrearage due the dormer spouse. However, under § 838.225, OPM will prospectively honor the terms of an amended court order that either increases or decreases the court order's entitlement.
Section 5 C.F.R. § 838.231 and 232 regarding payment procedures provide as follows:
§ 838.231 Commencing date of payments.
 (a) A court order acceptable for processing is effective against employee annuity accruing beginning the first day of the second month after OPM receives the court order.
 (b)(1) OPM will not begin payments to the former spouse until OPM receives all the documentation required by § 838.221(b) and (c).
 (2) If payments are delayed under paragraph (b)(1) of this CT Page 11981 section, after OPM receives all required documentation, it will authorize payment of the annuity that has accrued since the date determined under paragraph (a) of this section but the payment of which was delayed under paragraph (b)(1) of this section.
 § 838.232 Suspension of payments.
 (a) Payments from employee annuities under this part will be discontinued whenever the employee annuity payments are suspended or terminated. If employee annuity payments to the retiree are restored, payments to the former spouse will also resume subject to the terms of any court order acceptable for processing in effect at that time.
 (b) Paragraph (a) of this section will not be applied to permit a retiree to deprive a former spouse of payment by causing suspension of payment of employee annuity.
5 U.S.C. § 838.232 Termination of payments provides that a former spouse portion of an employee annuity stops accruing at the earliest of (d) the last day of the first month before the death of the retiree; or (e) except as provided in § 838.237, the date on which the former spouse dies.
The procedures for computing the amount payable provide in part under5 C.F.R. § 838.241 Cost-of-living adjustments as follows:
§ 838.241 Cost-of-living adjustments.
 Unless otherwise provided in the court order, when the terms of the court order or § 838.621 provide for cost-of-living adjustments on the former spouse's payment from employee annuity, the cost-of-living adjustment will be effected at the same time and at the same percentage rate as the cost-of-living adjustment in the employee annuity.
 § 838.302 Language not acceptable for processing.
 (a) Qualifying Domestic Relations Orders. (1) Any court order labeled as a "qualified domestic relations order" or issued on a form for ERISA qualified domestic relations orders is not a court order acceptable for processing unless the court order expressly states that the provisions of the court order concerning CSRS or FERS benefits are governed by this part.
CT Page 11982
 (2) When a court order is required by paragraph (a)(1) of this section to state that the provisions of a court order concerning CSRS or FERS benefits are governed by this part the court order must expressly —
 (b) Benefits for the lifetime of the former spouse. Any court order directed at employee annuity that expressly provides that the former spouse's portion of the employee annuity may continue after the death of the employee or retiree, such as a court order providing that the former spouse's portion of the employee annuity will continue for the lifetime of the former spouse, is not a court order acceptable for processing.
 5 C.F.R. § 838.303 provides as follows:
§ 838.303 Expressly dividing employee annuity.
 (a) A court order directed at employee annuity is not a court order acceptable for processing unless it expressly divides the employee annuity as provided in paragraph (b) of this section.
 (b) To expressly divide employee annuity as required by paragraph (a) of this section the court order must —
 (1) Identify the retirement system using terms that are sufficient to identify the retirement system as explained in § 838.611; and
 (2) Expressly state that the former spouse is entitled to a portion of the employee annuity using terms that are sufficient to identify the employee annuity as explained in § 838.612.
 5 C.F.R. § 838.304 providing for payment to the former spouse provides as follows:
§ 838.304 Providing for payment to the former spouse.
 (a) A court order directed at employee annuity is not a court order acceptable for processing unless it CT Page 11983 provides for OPM to pay the former spouse a portion of an employee annuity as provided in paragraph (b) of this section.
 (b) To provide for OPM to pay the former spouse a portion of an employee annuity as required by paragraph (a) of this section the court order must —
 (1) Expressly direct OPM to pay the former spouse directly;
 (2) Direct the retiree to arrange or to execute forms for OPM to pay the former spouse directly; or
 (3) Be silent concerning who is to pay the portion of the employee annuity awarded to the former spouse.
 (d) Although paragraphs (b)(2) and (b)(3) of this section provide acceptable methods for satisfying the requirement that a court order directed at employee annuity provide for OPM to pay the former spouse, OPM strongly recommends that any court order directed at employee annuity expressly direct OPM to pay the former spouse directly.
 5 C.F.R. § 838.305 OPM Computation of Formulas provides in section (b)(1) as follows:
§ 838.305 OPM computation of formulas.
 (a) A court order directed at employee annuity is not a court order acceptable for processing unless the court order provides sufficient instructions and information-that OPM can compute the amount of the former spouse's monthly benefit using only the express language of the court order, subparts A, B, and F of this part, and information from normal OPM files.
 (b)(1) To provide sufficient instructions and information for OPM to compute the amount of the former spouse's share of the employee annuity as required by paragraph (a) of this section the court order must state the former spouse's share as —
CT Page 11984
(i) A fixed amount;
 (ii) A percentage or a fraction of the employee annuity; or
5 U.S.C. § 838.306 specifying type of annuity for application of formula, percentage or fraction provides in part as follows:
 (b) The standard types of annuity to which OPM can apply the formula, percentage, or fraction are net annuity, gross annuity, or self-only annuity, which are defined in § 838.103. Unless the court order otherwise directs. OPM will apply the formula, percentage, or fraction to gross annuity. Section 838.625 contains information on other methods of describing these types of annuity.
The orders hereinafter entered are effective as of July 11, 1988. To the extent that the plaintiff has partially or fully complied with the orders hereinafter entered as a result of the orders entered on July 11, 1988, he does not have to comply with these orders a second time. Thus by way of illustration, to the extent that the plaintiff has already transferred to the defendant one-half of his Western Reserve Life IRA he does not have to again transfer to her one-half of that IRA. Similarly, to the extent that the plaintiff has made alimony payments following the July 11, 1988, order, he is to receive credit for those payments against the order hereinafter entered by this court.
This court has considered the provisions of § 46b-82 regarding the issue of alimony, and has considered the provisions of § 46b-81 (c) regarding the issue of property division, and has considered the provisions of § 46b-62 regarding the issue of attorney's fees.
This court enters the following orders:
 ORDERS
I. By way of Property Orders
1. The condominium located at 12 Quarry Village, Cheshire, Connecticut, is awarded to the defendant. The plaintiff is to retain $50,900 previously paid to him by the defendant or whatever balance he still has on hand, if any.
2. The 1983 Chevrolet shown on the plaintiff's financial affidavit is awarded to the plaintiff. CT Page 11985
3. All personal clothing and furniture owned by the plaintiff and in his possession is awarded to the plaintiff.
4. The Credit Union balance account with a balance of $450 and the stocks and bonds with a total value of $4,005.60 shown on the plaintiff's financial affidavit dated July 1, 1988, are ordered divided equally between the parties.
5. The Western Reserve Life IRA with an approximate value of $2,000 is ordered divided equally between the parties.
6. All liabilities shown on the plaintiff's financial affidavit dated July 1, 1988, are to be paid by the plaintiff and he is to hold the defendant harmless therefrom, except for the first mortgage on the condominium located at 12 Quarry Village, Cheshire, Connecticut which the defendant is to pay and is to hold the plaintiff harmless therefrom.
7. The Idex Fund IRA owned by the plaintiff is awarded to the plaintiff.
8. The 1978 AMC and 1978 Mustang are both awarded to the defendant.
9. All furniture and furnishings and clothing in the possession of the defendant are awarded to the defendant.
10. The liability shown on the defendant's financial affidavit dated July 1, 1988, is to be paid by the defendant and she is to hold the plaintiff harmless therefrom.
11. The 20% interest that the defendant owns in real estate is awarded to the defendant.
12. The court enters the following orders regarding the plaintiff's pension plan through the Civil Service Retirement System. These orders are effective as of July 11, 1988 (as are all other property orders and alimony orders). The court was not presented with any evidence upon which to determine the total amount of lifetime pension payments received by the plaintiff. Therefore, the exact amount of the arrearage owed by the plaintiff to the defendant as a result of the pension orders hereinafter entered will have to be determined at a subsequent post-judgment hearing. Eased on the testimony and evidence presented, the court finds that the approximate amount of the arrearage is $72,000. In the event of any dispute between the parties as to the exact amount of that arrearage as determined by OPM, this court retains jurisdiction to determine the exact amount of the arrearage owed by the plaintiff to the defendant. It CT Page 11986 is the intent of these orders that the defendant as the ex-spouse of the plaintiff receive a percentage of the plaintiff's gross lifetime annuity payments.
A. The court has considered the requirements and standard terminology provided in part 838 of Title 5, Code of Federal Regulations. The terminology used in the provisions of this order that concern benefits under the Civil Service Retirement System are governed by the standard conventions established in that part.
B. Mario S. Rosato will be eligible for retirement benefits under the Civil Service Retirement System based on employment with the United States government. Beatrice M. Rosato, his former spouse is entitled to and is to be paid 50% of Mario S. Rosato's gross monthly annuity under the Civil Service Retirement System. The United States Office of Personnel Management is directed to pay Beatrice M. Rosato's share directly to Beatrice M. Rosato.
C. If Beatrice M. Rosato dies before Mario S. Rosato, the United States Office of Personnel Management is directed to pay Beatrice M. Rosato's share of Mario S. Rosato's Civil Service Retirement Benefits to surviving children of the marriage including any adopted children, in equal shares. Upon the deaths of any child, that child's share will be distributed amongst the other surviving children.
D. Beatrice M. Rosato is responsible for notifying OPM of this orderregarding Mario S. Rosato's annuity benefits. In accordance with5 C.F.R. § 838.224 (b) Beatrice M. Rosato is required to certify thatthis order is currently in force and has not been amended, superceded orset aside.
E. It is the intent of this order that Beatrice M. Rosato share in 50% of the gross amount of all cost-of-living adjustments received by Mario S. Rosato since July 11, 1988.
F. In accordance with the provisions of 5 C.F.R. § 838.225, this court expressly directs OPM to adjust the payment to be made to the defendant in order for OPM to pay directly to the defendant the total arrearage due to her. The length of time over which OPM is to make the adjustment is ten years commencing on the first day of the second month following the month in which OPM receives this order. The formula to compute the amount of the monthly adjustment is as follows: (a) first determine the gross amount of annuity benefits received by the plaintiff from July 11, 1988 to date, including cost-of-living gross payments; (b) Take one-half of that gross amount and reduce that one-half by the amount of annuity payments paid directly to the defendant by OPM; (c) The CT Page 11987 reduced amount represents the arrearage owed by the plaintiff to the defendant. Divide the reduced amount by 120 months. By way of illustration in the event the gross amount of annuity benefits received by the plaintiff from July 11, 1988 to date including cost-of-living adjustments was $220,000 then one-half of that amount would be $110,000. If the amount previously paid to the defendant was $50,000 that would leave a reduced amount of $60,000. The $60,000 would be divided by 120 months which would amount to $500 per month with the $500 per month representing the monthly adjustment to be made in order to discharge the arrearage owed by the plaintiff to the defendant. For each month in which OPM does not pay the additional adjusted amount directly to the defendant towards the discharge of the arrearage owed to her, the plaintiff is to pay $645 monthly directly to the defendant by the 15th day of each month of the month that OPM did not make the arrearage payment directly to the defendant. The arrearage is to be paid without interest provided the payments are made timely. In the event that the payments are not made timely, then interest on the remaining unpaid arrearage is to run at the rate of 8% per annum.
In the event the plaintiff dies before the arrearage has been paid in full, then the remaining unpaid balance of the arrearage is to be immediately due and payable upon his death. Once the arrearage has been paid in full OPM is to continue to pay directly to the defendant the 50% of the plaintiff's gross monthly annuity under the Civil Service Retirement System.
II. By way of Alimony
1. The plaintiff is to pay to the defendant alimony in the amount of $250 weekly.
2. Alimony shall terminate upon the earliest of the following events: a) the death of the plaintiff; b) the death of the defendant; c) the remarriage of the defendant.
On the date the plaintiff commences to receive his lifetime annuity payments, the alimony order is to be reduced to $1 per year. In the event of any action taken by the plaintiff that results in a delay of the defendant receiving her share of the plaintiff's annuity, even if such share is being held in escrow, then the alimony order in the amount of $250 per week is to remain in full force and effect as of the date the plaintiff commenced to contest the validity of this court order dividing his lifetime pension plan. This court would have entered all of the same identical financial orders regarding alimony, property and attorney's fees that it entered even if the provision for the $250 per week alimony order to remain in full force and effect was determined to be an invalid CT Page 11988 provision.
III. By way of Attorney's Fees
1. All attorney's fees previously paid by the plaintiff to the defendant are to be retained by the defendant.
IV. By way of Miscellaneous Orders
1. Counsel for the plaintiff is to prepare the judgment file within 30 days and file it in the clerk's office.
2. The parties are to exchange copies of their federal and state income tax returns commencing with, the calendar year 2001 for each year in which there is an outstanding alimony order or any arrearage thereto or an outstanding property order or any arrearage thereto.
3. The court appreciates the cooperation that has been shown by postal employees in providing information that has been useful to the court in the trial before this court. The court realizes that in order to determine the exact amount of the arrearage that future cooperation either by OPM and/or postal employees would be a great assistance to both parties and the court strongly urges such future assistance.
AXELROD, J.